Filed 4/16/26  In re J.P. CA4/2

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re J.P., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E087032 |
| Plaintiff and Respondent | (Super.Ct.No. RIJ1400417) |
| v. | OPINION |
| D.C. et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of Riverside County.  Elizabeth Tucker, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Conditionally reversed and remanded with directions.

Tracy M. De Soto, under appointment by the Court of Appeal, for Defendant and Appellant, D.C.

1

Paul A. Swiller, under appointment by the Court of Appeal, for Defendant and Appellant, C.P.

Minh C. Tran, County Counsel, Jamila T. Purnell and Catherine E. Rupp, Deputy County Counsel, for Plaintiff and Respondent.

The juvenile court terminated defendants and appellants D.C.'s (mother) and C.P.'s (father, collectively parents) parental rights as to J.P. (minor born May 2024). On appeal, mother contends the court erred in denying her Welfare and Institutions Code section 388[1] petition and committed reversible error in finding that plaintiff and respondent, Riverside County Department of Public Social Services (the department), complied with their duty of inquiry with respect to the Indian Child Welfare Act of 1978 (ICWA; 25 U.S.C. § 1901 et seq.) and section 224.2, subdivision (a) (Cal-ICWA). Father contends the court abused its discretion in denying his request for a continuance and joins mother's ICWA claim. We conditionally reverse and remand.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On May 17, 2024, personnel from the department received an immediate response referral alleging general neglect. When mother gave birth to minor, she "admitted to using methamphetamine, alcohol, and marijuana throughout her pregnancy." Mother "shared she was in a violent relationship with [minor's] father, and she ended up leaving him, resulting in being homeless." "[M]other expressed she planned to go into outpatient treatment once discharged."

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

The social worker spoke with mother, who "denied having any current [drug] use and reported that she last used in November 2023 and discontinued using once she found out that she was pregnant and enrolled" in a treatment program. "[M]other reported that in the past, she would consume alcohol, smoke marijuana, and use methamphetamine. The mother reported she has been abusing substances for the past ten years. She reported she started by abusing alcohol, which progressed into marijuana and then methamphetamine. The mother reported that throughout the past ten years, she has been in several rehabilitation programs to gain sobriety; however, she would relapse."

"[M]other reported being drug tested three times weekly and always tested negative." Mother agreed to a saliva drug test, which reflected negative for all substances. Minor's meconium test results reflected "negative for Amphetamine, Methamphetamine, Cocaine, Opiate, Phencyclidine, and Tetrahydrocannabinol."

"[M]other reported she has previous domestic violence concerns (physical and verbal altercations) with the . . . father, . . . which is why she broke up with him in November 2023. The mother also disclosed that the . . . father was struggling with substance use, and as she was trying to become clean, he continued to use, which was another reason why she had broken up with him. The mother reported that the . . . father was currently in drug rehabilitation and denied knowing what rehabilitation he was in." Mother denied any Native American heritage.

Mother had a prior dependency history involving substantiated allegations of domestic violence, general neglect, emotional abuse, and substance abuse. A juvenile

3

court had previously terminated mother's reunification services as to two of minor's older half siblings and her parental rights as to one of them. Mother had a prior criminal history involving convictions for petty theft and infliction of corporal injury on a spouse. Father had a criminal history involving convictions for possession of controlled substances, assault on a person inflicting great bodily injury, and receiving stolen property.

On May 28, 2024, the social worker received a call from father. He reported being discharged from a program a few days earlier. He said that "mother was using at the beginning of her pregnancy; however, when she found out that she was pregnant in November 2023, she entered a treatment program. The . . . father reported that he and the mother used methamphetamine daily together during their relationship. The . . . father reported that he had been using methamphetamine for the past year with the mother. The . . . father reported he had been using methamphetamine up until forty days ago in April 2024, when he entered [treatment] for substance use." Father denied any Indian ancestry.

On May 30, 2024, the social worker informed father the department was detaining minor from father. On June 3, 2024, the department filed a section 300 juvenile dependency petition alleging that mother had used controlled substances during her pregnancy (b-1), that she had an extensive history of substance abuse (b-2), that mother had an extensive history of domestic violence (b-3), that father had a history of domestic violence (b-4), that father has an unresolved history of abusing controlled substances (b-

4

5), that father had a criminal history (b-6), and that courts had previously terminated mother's reunification services and parental rights (b-7). At the detention hearing on June 4, 2024, the court detained minor.[2]

Mother filed an ICWA-020 form indicating she had Apache heritage through an unspecified grandmother. Father filed an ICWA-020 form reflecting he had no Indian ancestry.

On July 9, 2024, the department filed an interlineated juvenile dependency petition amending the original petition by reflecting that mother used controlled substances only at "the beginning of" her pregnancy (b-1) and deleting the b-6 allegation.

In the jurisdiction and disposition report filed on July 9, 2024, the social worker reported mother "indicated she has never lived on registered land, received tribal services, or benefited from Native services. She shared she did not have any Native American ancestry and said [ICWA] did not apply." Father said he did not have any Native American heritage. Mother was staying at a sober living facility.

In an addendum to the jurisdiction and disposition report, the social worker recommended the court find the allegations in the petition true; adjudge minor a dependent of the court; remove minor from the physical custody of father; deny father reunification services pursuant to section 361.5, subdivision (b)(12) [parent convicted of a violent felony]; and offer mother family maintenance services. Father provided the

---

[2] A reporter's transcript of the detention hearing is not included in the record on appeal.

5

social worker with a letter reflecting that he had been participating in individual and group counseling and random drug testing in an outpatient recovery program.

On August 27, 2024, the court found the allegations in the amended petition true, removed minor from father's custody, bypassed father's reunification services, and ordered family maintenance services for mother.[3]

On September 9, 2024, department personnel received a referral alleging general neglect of minor by mother. On September 3, 2024, mother had called friends saying she was "'struggling.'" She had moved away from the sober living facility. Mother's friends had offered to pick up minor; mother agreed. When they had arrived, mother smelled like alcohol and "'seemed out of it.'" Mother's friend took minor under her care. Mother's friend said that since caring for minor, mother had been drinking daily. Mother requested minor be returned to her care, claiming she had remained sober.

The department received a second referral on September 10, 2024, alleging mother had reached out to the nursing director of her recovery center, said she had relapsed, and asked the director if the director could care for minor. The social worker spoke to the director, who reported that mother had been testing negative for all substances on a daily basis until she discharged herself. Upon return, mother tested positive for alcohol. After mother left the center, she continued to maintain contact with the director; mother "called her, texted her, and left voice messages, all in which [mother] continued to be distraught, emotional, and apparently drunk, evidenced by her slurred speech and senseless talking."

_____

[3] A reporter's transcript of the jurisdiction and disposition hearing is not included in the record on appeal.

6

Mother went to the hospital, where she was asked to leave because she was arguing with the staff. Mother "believed she was suffering from pancreatitis but admitted she was drinking alcohol on a daily basis." The social worker later spoke with mother, who said she was hospitalized. The social worker noticed mother's "speech was slurred and disorganized." Mother "shared she had been sober since September 10, 2024[,] and became sober after admitting herself into the hospital due to her mental health, substance use, and other physical health issues." Mother said that the stress with respect to raising minor "led her to relapse on alcohol on September 2, 2024, and after relapsing, she realized [minor] was no longer safe with her and sought support from [minor's] godmother, . . . . She expressed being aware that her lack of sobriety hindered her ability to provide safe and adequate parenting for [minor]."

On September 12, 2024, the court issued a protective custody warrant for minor. The social worker contacted mother regarding the warrant; mother "recanted her previous disclosure regarding her relapse." Mother denied that she tested positive for alcohol.

The social worker called the paternal grandmother and informed her that father had identified her as someone with whom he would like the department to place minor. However, she and father lived together. The social worker informed her that father would have to move out before she could be assessed for placement of minor. The paternal grandmother identified a paternal aunt as someone else with whom the department could place minor. On September 12, 2024, the department temporarily placed minor with minor's godmother.

7

On September 11, 2024, both parents denied any Native American ancestry. The social worker recommended the court find that ICWA did not apply.

On September 16, 2024, the department filed a supplemental petition alleging, "The previous disposition has not been effective in the protection of the child in that despite receiving substance abuse treatment and residing in a sober living facility, the mother relapsed on alcohol on September 2, 2024[,] and prematurely exited her program. Furthermore, on September 11, 2024, the mother acknowledged her relapse 'hindered her ability to provide safe and adequate parenting' for her child, who is of a tender age."

On September 17, 2024, the court detained minor from mother's custody. The court found ICWA did not apply.

In the October 4, 2024, jurisdiction and disposition report, the social worker recommended that the court find the allegation in the supplemental petition true; remove minor from mother's custody; deny mother reunification services pursuant to section 361.5, subdivisions (b)(10) [court has terminated reunification services for a sibling], (b)(11) [court has terminated parental rights for a sibling], and (b)(13) [parent has a history of extensive, abusive, and chronic use of drugs or alcohol and has resisted prior treatment]; and set the section 366.26 hearing.

On September 18, 2024, the social worker had spoken to father, who denied any Indian heritage. On September 30, 2024, the social worker had spoken to mother, who denied any Native American ancestry. The social worker recommended the court find that the department had made sufficient inquiry and that ICWA did not apply.

8

At a hearing on October 7, 2024, father's counsel noted the court had yet to elevate father to presumed father status because he had yet to visit minor. The court continued the matter for a contested hearing.

In the addendum to the jurisdiction and disposition report, the social worker reported that minor had been placed in the care of the paternal aunt on November 9, 2024.

At the hearing on December 3, 2024, the court found the department had made sufficient inquiries and that ICWA did not apply. The court sustained the allegation in the supplemental petition; removed minor from mother's custody; denied her reunification services pursuant to section 361.5, subdivision (b)(10), (b)(11), and (b)(13); and set the section 366.26 hearing.

On March 4, 2025, the department sent notices of the sections 366.26 and 366.3 hearings to the Blackfeet Tribe, the Cherokee Nation, the United Keetoowah Band of Cherokee Indians, and the Eastern Band of Cherokee Indians.

In the March 18, 2025, section 366.26 report, the social worker recommended the court continue the hearing for 120 days for the paternal aunt's home to be fully approved through the adoption unit. On January 13, 2025, mother had again denied any Native American ancestry. On March 5, 2025, father had again denied any Indian heritage.

Parents had one-hour, in-person, supervised visitation every other month. Both parents had also been receiving more frequent visits via zoom; "these visits are reported

9

and are observed to be appropriate with both parents and the parents appear to be compliant with their visits."

The paternal aunt, with whom minor had been placed, had "expressed that [she] [was] willing, able and committed to adopting [minor]." "[T]he prospective adoptive parents have since established a loving and caring relationship with the child . . . and the family have bonded very well with him. Furthermore, [minor] has been observed to have formed a very secure attachment to his relative caregivers and he continues to thrive very well in all aspects, developmentally, physically, socially and he continues to be provided with a safe, stable and structured environment."

On April 3, 2025, the court continued the section 366.26 hearing.[4] On May 14, 2025, the department filed an ICWA further inquiry letter notifying the Bureau of Indian Affairs, the Apache, Cherokee, and Blackfeet Tribes that a section 366.26 hearing had been set and requesting whether the family members listed were enrolled or eligible for enrollment in the tribes.

On June 27, 2025, mother filed a section 388 petition requesting reunification services and increased visitation. Mother alleged as changed circumstances that she had been enrolled in and completed several services; she alleged the request was in minor's best interest because they shared a bond. The court ordered a hearing on the petition.

---

[4] The minute order reflects that the court made a further inquiry as to whether the department made an adequate investigation of parents' Indian ancestry; the minute order further reflects that the court found sufficient inquiry had been made, no further information had been forthcoming, and that ICWA did not apply. However, the reporter's transcript reflects no such inquiry or findings.

On the same date, the department filed a tribal response letter reflecting that the Blackfeet Nation, Tonto Apache Tribe, Mescalero Apache Tribe, San Carols Apache Tribe, Fort Sill Apache Tribe, and Yavapia Apache Nation all indicated that minor was ineligible for enrollment. On July 24, 2025, the department filed another tribal response letter reflecting that the Eastern Band of Cherokee Indians, the United Keetoowah Band of Cherokee Indians, and the White Mountain Apache Tribe had determined that minor was ineligible for enrollment. The Cherokee Nation of Oklahoma Tribe indicated that without information regarding minor's parents, it could not determine whether minor was an Indian child.[5]

On August 6, 2025, the department filed a response to mother's section 388 petition recommending that the petition be denied. The social worker indicated that she had been present during in-person and Zoom visits and had observed that mother "appears to be 'high' based on her behavior . . . which includes slurred speech, seeming disoriented, and spaced out. In addition, during the last in-person visit between [mother] and the child . . . she appeared somewhat 'off.'" "There are serious concerns that [mother] will continue to have relapses, as she has done in the past, which in turn would be detrimental to the child." Mother "has been in and out of several treatment facilities but has not benefited from them because she has continuously relapsed." "[T]here are

_____

[5] The ICWA further inquiry letter in fact contained the names and birthdates of numerous family members including minor, mother, father, the maternal grandfather, two maternal great grandmothers, a maternal grandmother, and other relatives.

11

serious concerns that [mother] will relapse as she has done several times, which has led to her losing custody of her two older children and not reunifying."

On August 8, 2025, the court set the section 388 petition hearing for a contested hearing. Mother filed the results of negative drug and alcohol tests occurring on December 19 and 26, 2024; January 9, 16, 23, and 30; February 6, 13, and 21; April 17; May 19; June 23; and July 10, 2025.

On August 19, 2025, the department sent notice of the section 366.26 hearing to parents, the Jicarilla Apache Nation, and the Oklahoma Apache Tribe.

On September 2, 2025, the social worker filed a preliminary adoption assessment recommending the court find minor adoptable and terminate parents' parental rights.. The social worker noted that minor's prospective adoptive parents "were loving and attentive towards him and [he] sought the caregivers out for comfort, affection, attention, and to get his needs met." "The prospective adoptive parents' motivation for adopting [minor] is their 'love' for him. They are relatives and would like him to remain with family. They want to keep [minor] in their care and are committed to providing him with a loving, permanent home." Minor "has made an excellent adjustment to this placement and is clearly well bonded to the prospective adoptive family, which is reciprocated." Minor calls them "'Papa and Moma' and he is affectionate with them, giving them hugs and kisses."

On September 3, 2025, father filed a section 388 petition requesting reunification services and increased visitation. He alleged as changed circumstances that he had

12

participated in an outpatient treatment program, a 10-week parenting program, and had learned conflict resolution skills. Father contended the requested change would be in minor's best interest because it would provide minor "with both parents who are working to reunify."

At the hearing on September 9, 2025, the court ordered a hearing on father's petition. The department argued, with respect to the section 388 petitions, that because services to parents had been bypassed, "the Court will need to make a finding that it's in the best interests of the minor by clear and convincing evidence . . . ."

With respect to mother's petition, the court noted, "I appreciate the fact that mother has been doing programs on her own to try to fix the problem. I can see that she's made efforts on her behalf to try to do that, but as everyone knows, people with a serious substantial history of substance abuse, it's not a 'Once done, it's over' kind of situation. It's an ongoing battle to maintain sobriety and to do well."

The court continued, "I cannot say here today that the circumstances have changed. I think they're changing, but even if they were changed, my biggest problem is trying to figure out how I can possibly say that it's in the best interests of the child by clear and convincing evidence." "Mother has previously had her parental rights terminated twice [*sic*]. The child was removed from her care approximately when the child was about six months old or so. The child has been with the caregiver since November of last year, stable in a home environment. I don't see how it would be in the

best interests at this time for me to say we should change course." The court denied parents' petitions.

On September 19, 2025, the department filed a tribal response letter from the Cherokee Nation and the Apache Tribe of Oklahoma reflecting that minor was ineligible for enrollment. On September 22, 2025, the department notified parents and the Jicarilla Apache Nation of the date of the section 366.26 hearing.

In the September 23, 2025, section 366.26 report, the social worker continued to recommend the court find minor adoptable and terminate parents' parental rights. Both parents denied any Indian ancestry when asked on August 17, 2025. Thus, the social worker recommended the court find ICWA did not apply.

Regarding visitation, the social worker indicated, "During this reporting period, both parents have been receiving visits via Zoom; the visits were appropriate most of the time; however, there were some concerns regarding the mother, who would sometimes appear to be inebriated and appear to be under the influence when she is on the Zoom call with the child, . . . Furthermore, during the last in-person visit, [mother] appeared as if she was under the influence; however, the visit was closely monitored."

As to father, the social worker reported, "there are some concerns as to his ability to care for his son . . . ; furthermore, it should be noted that during his visits with his son, there were also concerns as to whether or not he was under the influence of alcohol or drugs. However, it should be noted that his visits were also closely monitored."

14

At the section 366.26 hearing on October 3, 2025, father's counsel noted that father was "present via Zoom." Father's counsel further noted, "Listening to Father just now, it sounded like he was asking for a continuance." "But Father would like a continuance, and he would like to be able to address Your Honor."

The court asked the grounds for the continuance request. Father's counsel responded, "I honestly don't know, your Honor." The court agreed to let father speak on the record.

Father said, "I move to continue this hearing on three grounds. First of all, I was never properly served with JV-800. The County improperly sent it to son's mother . . . instead of serving me directly. It violates the California Rules of Court. [¶] The second is the notice it changed my name, misspelled [it] . . . making it a defective notice under due process. [¶] Third, I have evidence the County attempted to coerce me to waive my rights to a third party, which violates my constitutional rights. I have screenshot evidence of this violation and request an immediate continuance."

The department responded, "It appears that both parents were present at the last [hearing] and ordered back. The Court dispensed with further statutory notice. Notice was then further submitted via First Class mail, and also served on August the 19th, 2025. [¶] So the parents have been—we've been fortunate that they've been present at all relevant hearings, including the past two-six. That notice that was provided, it was effective in that we have both parents appearing before the Court today, so I do not believe that there has been any issue with the integrity of notice for parents."

15

After hearing from mother and minor's counsel, the court noted, "Evidently, Father just hung up. All right. At this time, the Court is denying Father's request to continue this hearing, finding legal proper notice has been accomplished, and not finding good cause to continue." The court found minor adoptable and terminated parents' parental rights.[6]

On October 13, 2026, father filed another section 388 petition, noting that his parental rights had been terminated "after zoom call dropped . . . ." "Zoom connection failed (technical issues). I was unable to participate, present evidence, or make arguments. This denied me due process of law . . . ." The court denied the petition noting that "parental rights were terminated prior to the submission of [the] request. Father was given [an] opportunity to be heard prior to phone call ending."

## II.  DISCUSSION

Mother contends the court erred in denying her section 388 petition and committed reversible error in finding that the department complied with its duty of inquiry with respect to ICWA and Cal-ICWA. Father contends the court abused its discretion in denying his request for a continuance and joins mother's ICWA claim. We agree with parents that the order terminating their parental rights must be conditionally reversed and remanded for proper ICWA inquiry.

---

[6]  The minute order reflects that the court found that the department had made sufficient inquires and that ICWA did not apply; however, the reporter's transcript does not reflect any such findings.

16

A. Mother's Section 388 Petition

Mother contends the court abused its discretion in denying her section 388 petition by applying the wrong burden of proof. We agree that the court stated the wrong, heightened burden of proof when denying mother's petition; however, we find the error harmless.

"Section 388 provides for modification of juvenile court orders when the moving party (1) presents new evidence or a change of circumstance and (2) demonstrates modification of the previous order is in the child's best interest. [Citations.] '"The petitioner has the burden of showing by a preponderance of the evidence (1) that there is new evidence or a change of circumstances *and* (2) that the proposed modification would be in the best interests of the child."'" (*In re Matthew M.* (2023) 88 Cal.App.5th 1186, 1194.)

"A petition which alleges merely changing circumstances and would mean delaying the selection of a permanent home for a child to see if a parent, who has repeatedly failed to reunify with the child, might be able to reunify at some future point, does not promote stability for the child or the child's best interests." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 47, overruled on other grounds in *In re Caden C.* (2021) 11 Cal.5th 614, 636, fn. 5.) The "simple completion of . . . classes taken by the [parent] . . . does not, in and of itself, show prima facie that either the requested modification or a hearing would be in the minor's best interests. [Citations.]" (*In re Angel B.* (2002) 97 Cal.App.4th 454, 462-463.)

Chronic substance abuse is generally considered a serious problem and, therefore, is less likely to be satisfactorily ameliorated in the brief time between termination of services and the section 366.26 hearing.  (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 528, 531, fn. 9 ["It is the nature of addiction that one must be 'clean' for a much longer period than 120 days to show real reform"]; *In re Cliffton B.* (2000) 81 Cal.App.4th 415, 423 ["seven months of sobriety since [the father's last] relapse . . . while commendable, was nothing new"]; *In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223 [The mother's "recent sobriety reflects 'changing,' not changed, circumstances"]; *In re C.J.W.* (2007) 157 Cal.App.4th 1075, 1081 [Parents' three months of rehabilitation services was insufficient based on their "extensive histories of drug use and years of failing to reunify with their children"]; *In re Mary G.* (2007) 151 Cal.App.4th 184, 206 [Three months of services weighed against 23 years of drug abuse not changed circumstances]; but see *In re Aljamie D.* (2000) 84 Cal.App.4th 424, 432 [Mother made a prima facie showing where "[s]he had completed numerous educational programs and parenting classes, and had tested clean in weekly random drug tests for over two years"].)

"When, as in this case, a section 388 petition is filed after family reunification services have been terminated, the juvenile court's overriding concern is the child's best interests.  [Citation.]  The parent's interests in the care, custody and companionship of the child are no longer paramount; and the focus shifts to the needs of the child for permanency and stability.  [Citations.]  Nonetheless, a parent may rebut the presumption that continued care is in the best interest of the child after termination of reunification

18

services by showing that circumstances have changed and would warrant further reunification services. [Citation.]" (*In re Malick T.* (2022) 73 Cal.App.5th 1109, 1122-1123 (*Malick*).)

"We review the court's best interest determination, the second step, for abuse of discretion and may disturb the exercise of that discretion only in the rare case when the court has made an arbitrary or irrational determination. [Citations.] We do not inquire whether substantial evidence would have supported a different order, nor do we reweigh the evidence and substitute our judgment for that of the juvenile court. [Citation.] We ask only whether the juvenile court abused its discretion with respect to the order it made. [Citation.]" (*In re Matthew M.*, *supra*, 88 Cal.App.5th at pp. 1194-1195.) The denial of a section 388 motion rarely merits reversal as an abuse of discretion." (*In re Amber M.* (2002) 103 Cal.App.4th 681, 685-686.)

"However, when the court's denial is based on a mistake of law, our review is de novo." (*Malick*, *supra*, 73 Cal.App.5th at p. 1123.) "The harmless error doctrine applies in dependency cases. [Citations.] . . . . '"Reversal is justified 'only when the court, "after an examination of the entire case, including the evidence," is of the "opinion" that it is reasonably probable that a result more favorable to the [petitioning] party would have been reached in the absence of the error.'"' [Citation.]" (*Id.* at p. 1128; see *In re J.P.* (2014) 229 Cal.App.4th 108, 128-129 [harmless where juvenile court erroneously failed to hold a hearing on a § 388 petition]; *In re G.B.* (2014) 227 Cal.App.4th 1147, 1162.)

Here, the court erroneously stated that mother's burden of proof on the petition was clear and convincing evidence. However, we hold that it is not reasonably probable the court would have found in mother's favor had it applied the preponderance of the evidence standard.

Among other issues, mother had a longstanding and extensive history abusing both controlled substances and alcohol. In mother's *three* 2008 dependency referrals, it was reported that mother and father would argue while drunk, that mother was an alcoholic, that mother drank alcohol throughout her pregnancy, that she would drive minor's sibling while she was drunk, that she would get very violent when she drank, and that father would come home from work and find mother drunk. In mother's 2010 dependency case, it was noted that mother disclosed "that she had a history of alcohol abuse." In a 2012 referral, "mother was in a rehabilitation center at Gibson House and had a Court date on November 27, 2012, for possession and drunk in public."

In the instant case, mother reported she had been abusing substances for the past 10 years. She reported she started by abusing alcohol, which progressed into marijuana and methamphetamine abuse. Mother reported that throughout the past 10 years, she had been in several rehabilitation programs to gain sobriety; however, she would always relapse.

When mother gave birth to minor, she admitted using methamphetamine, alcohol, and marijuana throughout her pregnancy. Father reported that he and mother used methamphetamine daily together during the previous year of their relationship.

Although mother entered a sober living facility after being released from the hospital, she precipitously moved out of the facility when struggling with minor's care. Mother's friend picked up minor and noted that mother smelled of alcohol and "'seemed out of it.'" Mother's friend said mother began drinking daily.

Mother admitted she had relapsed. Upon returning to her recovery center, mother tested positive for alcohol. The director reported that mother was "apparently drunk, [as] evidenced by her slurred speech and senseless talking." Mother admitted drinking alcohol on a daily basis. The social worker noted mother's speech was "slurred and disorganized." Mother admitted "that her lack of sobriety hindered her ability to provide safe and adequate parenting for [minor]."

After initially granting mother family maintenance services, the department filed a supplemental petition alleging the previous disposition had been ineffective due to mother's relapse. The court found the allegation true and bypassed mother's reunification services pursuant, in part, to section 361.5, subdivision (b)(13) (parent has a history of extensive, abusive, and chronic use of drugs or alcohol and has resisted prior treatment).

We acknowledge that mother provided proof of completion of an intensive outpatient program, completion of an alcohol and drug treatment program, enrollment and participation in a substance recovery program and AA meetings, as well as 13 negative drug and alcohol tests.

21

Nonetheless, at best, mother established about a year of sobriety. (*In re Amber M.*, *supra*, 103 Cal.App.4th at p. 686 [no abuse of discretion in denying § 388 petition where mother established only a 372-day period of abstinence].) However, the social worker observed during mother's supposed period of sobriety that mother "appears to be 'high' based on her behavior . . . which includes slurred speech, seeming disoriented, and spaced out." During mother's last in-person visit, mother "appeared as if she was under the influence."

Moreover, we note gaps in mother's drug testing between her September 2, 2024, relapse and her first drug test on December 19, 2024; no drug tests for nearly two months between February 21, and April 17; and no drug tests between July 10, 2025, and September 9, 2025, the date the court denied mother's petition. Thus, mother has not really established even a year of sobriety.

Furthermore, even when faced with the loss of custody of a third child and after being provided with family maintenance services, mother was still unable to maintain sobriety. (*In re Angel B.*, *supra*, 97 Cal.App.4th at p. 463 [Parent's completion of drug program and the time she had been sober "was very brief compared to her many years of drug addiction . . . and in the past she had been unable to remain sober even when the stakes involved were the loss of her other child"].)

In and of itself, mother's longstanding drug and alcohol abuse and history of relapsing, even during this case, reflects that mother's circumstances were, as the court noted, changing but not changed. (See *In re Casey D.*, *supra*, 70 Cal.App.4th at p. 47 ["A

22

petition which alleges merely changing circumstances and would mean delaying the selection of a permanent home for a child to see if a parent, who has repeatedly failed to reunify with the child, might be able to reunify at some future point, does not promote stability for the child or the child's best interests"].)

In addition, mother had an extensive history of domestic violence. In mother's *three* 2008 dependency referrals, it was reported that mother and the father would engage in domestic violence while drunk. There were prior law enforcement contacts due to a history of domestic violence between the parents. The "father reportedly pulled the mother down by her hair and pushed her head into a trash can full of beer cans."[7]

In her 2014 dependency referral, "It was reported that the mother reported an incident of domestic violence with the father . . . prior to her going to the hospital to deliver. The father reportedly punched the mother . . . in the head." Mother was convicted of corporal injury to a cohabitant in July 2015.[8] In the instant case, mother "shared she was in a violent relationship with [minor's] father."

The juvenile court found true allegations that parents had a history of domestic violence. Although mother alleged she had participated in or completed courses in "behavior modification" and "healthy relationships," no supporting documents were attached to her petition nor do any of those services appear to be directed specifically at

---

[7] The father mentioned in the previous referrals was not minor's father, who is a party in the instant case.

[8] Again, the father in these reports is not the party to the instant appeal.

domestic violence issues.  Mother's extensive domestic violence history independently supports the court's denial of her petition.

Delaying the selection of a permanent, adoptive home for minor in the parental aunt's home to see if a mother, who has failed to reunify with minor and his siblings, so that she "*might* be able to reunify at some future point, does not promote stability for the [minor] or the [minor's] best interests."  (*In re Casey D.*, *supra*, 70 Cal.App.4th at p. 47, italics added.)  Thus, the court properly denied mother's petition.

B.  Father's Request for a Continuance

Father contends the court abused its discretion in denying his request for continuance, particularly when his Zoom connection was lost.[9]  Father maintains that the court's ruling at the section 366.26 hearing without his input and without substantive information in the reports about his visitation with minor violated his due process rights. We disagree.

"[S]ection 352, subdivision (a) provides that if it is not contrary to the interests of the minor child, a trial court may grant a continuance in a dependency case for good cause shown, for the period of time shown to be necessary, and further provides that when considering whether to grant a continuance the court 'shall give substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary

---

[9]  In his reply brief, father contends the court failed to give him the opportunity to *rejoin* the section 366.26 hearing.  There is nothing in the record to suggest the father attempted to rejoin the hearing, let alone that the court denied him that opportunity.

placements.'  The trial court's ruling on whether a request for a continuance came within those guidelines is reviewed for abuse of discretion.  [Citation.]"  (*In re B.C.* (2011) 192 Cal.App.4th 129, 143-144 (*B.C.*).)

"Courts have interpreted this policy to be an express discouragement of continuances.  [Citation.]"  (*In re Elijah V.* (2005) 127 Cal.App.4th 576, 585.)  "'To show abuse of discretion, the appellant must demonstrate the juvenile court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a miscarriage of justice.'  [Citation.]"  (*In re Emily D.* (2015) 234 Cal.App.4th 438, 448.)

"In order to obtain a motion for a continuance of the hearing, written notice shall be filed at least two court days prior to the date set for hearing, together with affidavits or declarations detailing specific facts showing that a continuance is necessary, unless the court for good cause entertains an oral motion for continuance."  (§ 352, subd. (a)(3).)

Father's reasons for requesting the continuance were all unavailing.  First, California Rules of Court, rule 5.590 does not require that the court provide parties with copies of the JV-800 notice of appeal form when the court denies a section 388 petition, which is presumably of what father was complaining.  Moreover, any purported failure to serve father with the notice of appeal form would be harmless because father was able to and did file a notice of appeal, which could have included an appeal from the denial of his section 388 petition.[10]

---

[10] Defendant specified in his notice of appeal that he was appealing only from the order terminating his parental rights.  However, some courts have construed the notice of appeal to include the denial of a section 388 petition.  (*In re Madison W.* (2006) 141

[footnote continued on next page]

Second, the fact that defendant's name was misspelled, presumably in the notice of the section 366.26 hearing, does not make it defective for due process purposes.[11] The very fact that father appeared at the hearing, albeit virtually, reflects that father had actual notice of the hearing and, thus, was not deprived of due process. Third, neither father nor father's counsel introduced into evidence any documentation establishing that the department had attempted to *coerce* him into waiving his constitutional rights.[12]

Fourth, father failed to file a motion for a continuance, in writing, at least two court days prior to the date set for the hearing, "together with affidavits or declarations detailing specific facts showing that a continuance is necessary, unless the court for good cause entertains an oral motion for continuance." (§ 352, subd. (a)(3).) Thus, father failed to establish good cause for the continuance, and the court acted within its discretion in denying the request.[13]

---

Cal.App.4th 1447, 1451 [a parent's notice of appeal from an order terminating parental rights is liberally construed to encompass the denial of the parent's § 388 petition, provided the denial occurred within the 60-day period prior to the filing of the notice of appeal]; accord, *In re Angelina E.* (2015) 233 Cal.App.4th 583, 585, fn. 2.) Regardless, defendant does not here challenge the denial of his section 388 petition; thus, the issue is moot.

[11] Defendant's notice of the hearing on October 3, 2025, spells his name the same way it is spelled throughout the proceedings.

[12] Likely, father was simply referring to the department's advisement that he could voluntarily relinquish his parental rights.

[13] The argument that the court should have immediately stopped the hearing until such time as father chose to rejoin or simply continued the matter would provide a trump card to any parent wishing to stall the proceedings without good cause.

Father makes two post hoc complaints about the section 366.26 hearing. First, he argues that "he wished to substantially participate in the hearing." "Father hadn't even yet had the opportunity to address the court (through testimony or a statement) regarding the issues the court needed to decide before terminating parental rights." Thus, citing Penal Code section 2625, father contends the court's denial of his request for a continuance effectually denied him his right to testify.

However, respecting *incarcerated* parents, Penal Code section 2625 provides, "A proceeding shall not be held under . . . Section 366.26 of the Welfare and Institutions Code . . . without the physical presence of the [parent] or the [parent's] attorney, unless the court has before it a knowing waiver of the right of physical presence signed by the [parent] . . . stating that the [parent] has, by express statement or action, indicated an intent not to appear at the proceeding." (Pen. Code, § 2625, subd. (d).)

However, "the interest and goal of resolving dependency matters expeditiously 'would be thwarted if the proceeding had to be redone without any showing the new proceeding would have a different outcome.'" (*In re Marcos G.* (2010) 182 Cal.App.4th 369, 386 ["There can be meaningful access to a court through appointed counsel where the prisoner is given an opportunity to present testimony in some form and cross-examine witnesses"], quoting *In re Jesusa V.* (2004) 32 Cal.4th 588, 625 [Finding no reasonable probability parent would have obtained a more favorable result where error in adjudicating dependency petition in absence of the incarcerated parent was harmless

because the parent was represented by counsel who "made no offer of proof of the testimony [the parent] allegedly wanted to present"].)

Here, father is not incarcerated. Moreover, father was represented by counsel at the section 366.26 hearing. Furthermore, neither father nor father's counsel made any offer of proof that father wanted to testify. Indeed, father's counsel did not complain about the hearing continuing in father's virtual absence.[14] Additionally, if father wanted to participate substantially at the hearing, father could have appeared physically in court, which would have obviated any purported technical issues with the Zoom call.

Finally, we find no reasonable probability that father would have obtained a more favorable result had he been present at the hearing. Father did not start visiting minor until after the juvenile court bypassed both parents' reunification services. At best, he had a year of every other month, in-person visitation with minor and more frequent Zoom visits. The social worker noted that there were also concerns as to whether father was under the influence of alcohol or drugs during visits. Thus, there is no reasonable probability that father would have obtained a more favorable result had he been present at the hearing.

---

[14] Unlike the court and counsel below, we cannot discern father's tone when he was speaking to the court. The transcript reflects that the court had to tell father, "So, sir—now we are—hold on, sir. Stop. Yes, I will give you an opportunity, just hold on for one moment." "I am going to ask you to just slow down just a tiny bit so we can make sure that your words are documented in our record." Thus, contrary to father's assertion, the court's assumption that father simply hung up was not necessarily unreasonable.

Father additionally complains about the dearth of information regarding visitation in the reports. However, father never complained about the adequacy of the reports below. Where "no objection to the sufficiency of the assessment reports was made at time of trial, [we] refer to the familiar principle that failure to object to the admission of improper or inadequate evidence [forfeits] the right to raise the issue on appeal. [Citation.] If the complaint on appeal be deemed not the admissibility . . . of inadequate assessment reports, but substantive insufficien[c]y to establish requisite findings, this complaint, too, [is forfeited] by failure to raise it at the trial level. [Citation.]" (*In re Crystal J.* (1993) 12 Cal.App.4th 407, 411-412, fn. omitted; *In re Urayna L.* (1999) 75 Cal.App.4th 883, 886 [failure to raise adequacy of report below forfeited issue on appeal]; *In re Mary C.* (2020) 48 Cal.App.5th 793, 801 [by failing to object in the juvenile court to specific defects in the reports, parents forfeit any challenge to them on appeal].) "'The purpose of this rule is to encourage parties to bring errors to the attention of the trial court, so that they may be corrected. [Citation.]' [Citation.]" (*In re Daniel B.* (2014) 231 Cal.App.4th 663, 672.) Thus, defendant forfeited this argument by failing to object below.

Moreover, there were other ways father could have made up for the paucity of information in the reports on visitation, such as requesting a bonding study (*Caden C.*, *supra*, 11 Cal.5th at p. 633, fn. 4 ["Trial courts should seriously consider, where requested and appropriate, allowing for a bonding study or other relevant expert testimony"]), having the social worker testify, or having the paternal aunt testify. Father's failure to do

any of these forfeited any objection to the lack of information on visitation in the reports. Thus, the court properly denied father's request for continuance.

C. ICWA

Parents contend that the department failed to perform an initial inquiry with respect to the paternal aunt and paternal grandmother regarding their potential Indian heritage. Mother additionally argues that the department's notices to the tribes were inadequate because the paternal grandmother's information was not included. We agree in part.

"In 1978, Congress enacted the [ICWA] to 'formalize[] federal policy relating to the placement of Indian children outside the family home.' [Citation.] Under ICWA's state analogue statutes (Cal-ICWA; [citation]), courts and child welfare agencies are charged with 'an affirmative and continuing duty to inquire whether a child . . . is or may be an Indian child' in dependency cases. [Citation.] Child welfare agencies discharge this state law duty by 'asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled.' [Citation.]" (*In re Dezi C.* (2024) 16 Cal.5th 1112, 1124-1125 (*Dezi C.*), fn. omitted; accord *In re Kenneth D.* (2024) 16 Cal.5th 1087, 1099.)

"Agencies and juvenile courts have 'an affirmative and continuing duty' in every dependency proceeding to determine whether ICWA applies by inquiring whether a child

30

is or may be an Indian child.  [Citation.]" (*Dezi C.*, *supra*, 16 Cal.5th at pp. 1131-1332.) "[T]he duty to inquire 'includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child.' [Citation.] '[E]xtended family member' means 'a person who has reached the age of eighteen and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent.' [Citations.]" (*Id.* at p. 1132, fn. omitted; see *In re Kenneth D.*, *supra*, 16 Cal.5th at p. 1099, fn. 5.)

"The juvenile court's factual finding that ICWA does not apply is 'subject to reversal based on sufficiency of the evidence.' [Citation.]" (*Dezi C.*, *supra*, 16 Cal.5th at p. 1134; accord *In re Kenneth D.*, *supra*, 16 Cal.5th at p. 1101.)  "[T]he juvenile court's fact-specific determination that an inquiry is adequate, proper, and duly diligent is 'a quintessentially discretionary function' [citation] subject to a deferential standard of review.  [Citations.]  "'On a well-developed record, the court has relatively broad discretion to determine whether the agency's inquiry was proper, adequate, and duly diligent on the specific facts of the case.  However, the less developed the record, the more limited that discretion necessarily becomes."' [Citations.]" (*Dezi C.*, at p. 1141; accord *In re Kenneth D.*, at pp. 1101-1102.)

Reversal is not required where "every possible extended family member has not been asked about the child's Indian ancestry."  The department is not required "'to "find"

31

unknown relatives and others who have an interest in the child, merely to make reasonable inquiries. The operative concept is those people who are reasonably available to help the agency with its investigation.'" (*Dezi C.*, *supra*, 16 Cal.5th at p. 1140; compare *In re Y.W.* (2021) 70 Cal.App.5th 542, 553 (*Y.W.*) [department failed its duty of inquiry where it failed to locate and inquire of the minor's biological parents "once the social worker learned of a potentially viable lead to locate them"].)

Here, the paternal grandmother was reasonably available for the department to inquire regarding any potential Indian ancestry. Likewise, the paternal aunt was reasonably available for the department to inquire regarding any potential Native American heritage. In fact, the department placed minor with the paternal aunt on November 9, 2024, and she became the prospective adoptive parent. The social worker had a number of direct contacts with both relatives. However, the record contains no indication that the department ever inquired of the paternal aunt or the paternal grandmother regarding any potential Indian ancestry.[15] Thus, the department failed its duty of inquiry and the court's finding that ICWA did not apply is not supported by substantial evidence.[16]

---

[15] The department should also inquire of any other reasonably available extended relatives known to it on remand.

[16] Mother's complaint that the department's notices to the tribes were inadequate because the paternal grandmother's information was not included is moot since we are reversing in part for an inquiry into whether she has any Indian heritage. If not, then the prior notices to the tribes are irrelevant. If so, then the department will have to renotice the tribes.

## III.  DISPOSITION

The juvenile court's orders of October 3, 2025, are conditionally reversed and "remanded to the juvenile court for full compliance with the inquiry and notice provisions of ICWA and related California law and for further proceedings not inconsistent with this opinion."  (*In re M.B.* (2022) 80 Cal.App.5th 617, 630.)  After proper notice under ICWA, if it is determined that minor is an Indian child and ICWA applies to his case, the court shall proceed in conformity with ICWA.  If, after proper notice, the court finds minor is not an Indian child and ICWA does not apply in this case, the juvenile court's orders of October 3, 2025, shall be reinstated.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
Acting P. J.

We concur:

MENETREZ
J.

LEE
J.